# Miller *against* Cresson.

A warrant surveyed on land which has been improved by another, is not abso-
lutely void, but may be avoided at the instance of the improver, unless he has
abandoned his right before or after the survey.

Abandonment of land by a settler is not in all cases a matter of fact: it may
be a conclusion of law from facts.

To constitute an abandonment there must be an actual relinquishment of pos-
session by the settler without the intention of returning.

It is error to submit to the jury the question of abandonment, when there is no
evidence of a relinquishment of possession.

If a settler acquires a right to 400 acres by improvement, and afterwards sells
180 acres part thereof by courses and distances and boundaries, such conveyance
does not devest his title to the remainder of the tract, nor does it thereby become
vacant, so as to be liable to be taken up on a warrant to a third person.

A settler may circumscribe his boundaries, and when he does so in good faith,
the residue becomes vacant land: but his vendee of part cannot by circumscrib-
ing that part, deprive the settler of his right to the remainder.

[Miller v. Cresson.]

If a settler entitled to 400 acres gives to one who is purchasing 180 acres thereof from a third person, a written declaration that he had no right to the improvement, though such declaration may be an estoppel as to the 180 acres, yet it cannot be used as such by one claiming the remaining 220 acres without any consideration paid to the settler, or evidence that a purchaser was deceived by it, so as to purchase or expend his money on the faith of it.

Vague information by one not interested in the land, is not notice to a purchaser that another claim exists.

THIS was an action of ejectment for 195 acres of land, brought originally in the Common Pleas of *Schuylkill* county by the defendants in error, John H. Cresson, James Cresson and Joseph Cresson, against the plaintiff in error, Anthony F. Miller, in which a verdict and judgment were rendered in favour of the plaintiffs below in the Common Pleas of *Montgomery* county, to which the cause had been removed.

The plaintiffs gave in evidence a warrant dated 4th August 1824 to John Schall for 120 acres of land adjoining land of John Spayd, Esq., land late the property of John Kerschner, deceased, Jacob Merkle and Levi Blew's improvement, situated in Norwegian township, Schuylkill county; a survey thereon dated 9th September 1824, made by Frederick Lauderbrun, deputy-surveyor, for 195 acres, 76 perches and allowance; and patent to John Schall, dated 7th April 1825, for the consideration of $20.95, the moneys now paid, adjoining Levi Blew's improvement. Also a deed from John Schall and wife to the plaintiffs for the same, in consideration of $1656, with general warranty, dated 1st December 1828, recorded 13th January 1829, together with a release from John Dreher and wife to the plaintiffs of Dreher's interest in the land, in consideration of $5, dated 13th January 1829, recorded the same day. The plaintiffs further produced the application of Schall dated 2d August 1824, with the affidavit of John Kolb that the land was vacant.

The defendant gave in evidence a warrant dated 25th April 1835, to himself for 400 acres including an improvement, adjoining lands late of John Keller, John Chandler, now or late of Jeremiah Reed on the north; George Taylor, Jacob Heim and southeast corner of George Stitzell's improvement, on the south by Sharp mountain, situate on Shaffer's creek, Norwegian township—interest from the 1st April 1805; and survey by George Rahn, deputy-surveyor, dated 6th May 1835, containing 414 acres 28 perches. He then called witnesses who stated, there were since 1804 three improvements by the three sons of John Blew; John's who lived at the west end, Michael's in the middle and Levi's at the east end. Levi's (which was the part under which the defendant claimed) existed in 1808 and 1809. He had a house and two or three acres cleared and a saw-mill built on the land. Old John lived ten or twelve miles off. Levi left the improvement in 1819, giving the possession to Hollenbach, but there were fences till 1824. Old John Blew bought 1200 acres in 1802 or 1803 of Moyer: but,

it turned out he had no right, and then the old man and his sons went on improving the land, in order to hold it by improvement. They began in 1804.   Afterwards old John returned to the land and mortgaged the 1200 acres and died there in 1809.   Young John gave up his improvement to Levi and Michael.   After the father's death Michael and Levi continued, built a saw-mill and became indebted to Martin Price in $500 or upwards, and James Blew, their brother, became their bail and had to pay the money. About 1814, Levi and Michael sold to John Hughes for $3000, of which $400 were paid on account, and they moved off, but left a younger brother in possession.   Hughes becoming dissatisfied with the title, they agreed to take back the property, and gave Hughes a bond with John Addams as bail for $400; and Michael after-wards moved back and removed the saw-mill to another part of the land.   In July 1818, the land was sold on a judgment obtained by Hughes on the bond, and bought by James Blew, son of old John Blew, the land being described as containing 1200 acres more or less, adjoining lands of George Clauser, Jeremiah Reed, Jonathan Kerschner and others.   By deed from James Blew and wife, dated 27th August 1832, and recorded September 9th, the defendant had this title also.   After the sheriff's sale Michael moved away, but came back in two or three years, and Levi was then living there.

The defendant showed a mortgage by John Blew to Jacob Miller on the 11th January 1809, conditioned for the payment of £157 for a tract by courses and distances containing 1200 acres or thereabouts, on which a *scire facias* issued to August term 1811 against John Blew and eleven of his children described as his children and heirs, in which Levi Blew was a party, and filed an affidavit of defence 12th August 1814, and there was a verdict for the plaintiff for £209 11*s.* 6*d.*, and the land sold on a *levari* to April term 1816 for $1070 to Michael Bright, and a deed was made.   Evidence was given of the lines of the mortgage tract. Kolb proved he made the affidavit at the instance of Dreher, who made the survey, never having himself seen the land or known any. thing about it.

The defendant offered Jacob Seitzinger as a witness to prove that in the fall of 1828 or beginning of 1829 he was in conversa-tion with the Messrs Cressons : they said they were about buying, or had bought the land of Mr Schall.   He thought he stated Miller had a right.   His brother then told them that another man had bought the land of Mr Schall.   He said he could get Miller's claim and take it from them, and wanted witness to go down that night. The Cressons seemed scared, and said Schall was good enough, and he had agreed to guarantee the title.   The plaintiffs objected to this evidence, and the court rejected it and sealed a bill of exceptions.

The defendants then gave in evidence a deed-poll from John Blew, Sen., to Levi Blew and Michael Blew dated the — day of —— 1808, recorded 15th April 1811, conveying by courses and

[Miller v. Cresson.]

distances 1236 acres and allowance, reciting a deed-poll from
John Moyer to John Blew of the 11th June 1804 in consideration
of £60, conveying all his right, &c. in a tract in Norwegian town-,
ship adjoining lands claimed by Francis Umbehocker, late Edward
Pennington, John Kerchner, and other land of John Moyer, con-
taining 1236 acres, &c., surveyed by virtue of three warrants to
Charles Evans, Joseph Spayd and Conrad Feger, dated 19th No-
vember 1793. And also the record of a recovery in ejectment by
the present defendant against the present plaintiffs in Lehigh
county in 1837, which was reversed by the Supreme Court and a
*venire facias de novo* awarded; tried again in 1839 in Northamp-
ton county and a recovery by the plaintiff, which judgment was
affirmed on writ of error.

The plaintiffs then, after producing the application of the de-
fendant dated April 8th 1835, on which his warrant was obtained,
offered a certified copy of an application by John Blew, Sen.,
dated January 31st 1809 for 400 acres of land on the waters of
the West Branch of Schuylkill, including his improvement, con-
sisting of a dwelling-house and stable and about 10 acres cleared
by him and his family: and warrant issued 23d February 1809
and interest from 1st September 1804 and survey 6th March 1809
for 451 acres 149 perches and allowance, accepted 10th July 1809,
—to show that a man cannot have two improvements at the same
time. This was not any part of the lands now in question, but
several miles off. The defendant objected to this as irrelevant,
but admitted and exception taken.

This evidence was given, and the plaintiffs offered the applica-
tion of Niel Crosby 4th March 1829; warrant 7th March 1829
thereon for 180 acres, whereon an actual settlement has been
made, adjoining lands of the New York and Schuylkill Coal Com-
pany on the south, lands of Jacob Seitzinger and others on the
north, and lands of George Rahn and others on the east, situate in
Norwegian township, Schuylkill county; interest from 1st March
1804; surveyed by F. Lauderbrun, deputy-surveyor, 14th May
1829 for 52 acres 129 perches; patent 15th June 1829 to Thomas
Ridgway and John Schall for the same quantity—to show that the
plaintiffs were the owners of the tract and the extent of the im-
provement; and that they circumscribed their boundary and threw
out the land adjoining, now sued for in this ejectment. The
defendant objected to this evidence, but the court admitted it and
sealed a third bill of exceptions and the papers were then read.

The plaintiffs also offered a deed from Levi Blew and wife to
Niel Crosby, dated the 26th of March 1829, for 180 acres in con-
sideration of $500. Deed from Niel Crosby to Thomas S. Ridg-
way and John Schall, 12th of May 1829, for — acres. Deed,
25th of January 1830, from these grantees to the plaintiffs, for
three-fourths of the land in the patent, in consideration of $1680,
with general warranty. Deed, same date, from same to Adam

[Miller v. Cresson.]

Everly, for one-fourth of same, for consideration of $560, with general warranty. Deed, 23d of September 1835, from Everly to the plaintiffs, for this one-fourth. These were all objected to by the defendant, but admitted, and a fourth bill of exceptions taken.

The description in the deed from Levi Blew to Niel Crosby, (represented by the following diagram), was of all that certain messuage, tenement, tract of land, and improvement, situate in the township of Norwegian, county of Schuylkill, and State aforesaid; bounded and limited as follows, to wit: beginning at a post, thence along land surveyed to Benjamin Pott and Thomas Sillyman, south 62 degrees, west 354 perches to W. O., south 21 degrees, east 148 perches to a gum-tree corner, south 70 degrees, west 100 perches along land surveyed to James L. Dunn to a stone, and north 11 degrees, west 70 perches to W. O. corner in Michael Hollenbach's line, thence by same north 2 degrees, west 138 perches to B. O.; thence by Lewis Stitzell's improvement north 60 degrees, east 241 perches to a stone, south 30 degrees, east 18 perches to a stone, north 60 degrees, east 45 perches to a post; thence by land of late George Rahn south 42 degrees, east 28 perches to a hickory sapling, north 48 degrees 63 perches to a stone; thence by land of late John Schall, Esq. south 42 degrees, east 45 perches to a post, the above-mentioned place of beginning: containing by estimation about 180 acres, be the same more or less; it being the same tract of land which (the right and title thereto by improvement) was vested in the above said Levi Blew. Together with all, &c., to have and to hold the above said tract of land and improvement, &c.

Geo. Lewis Stitzell.

John C. Offerman.

Michael Hollenbach.

Geo. Rahn.

Levi Blew's Improvement.
180 A. more or less.

Mortgage line.

John Schall.

Thomas Sillyman.

Benj. Pott.

NEW YORK COMPANY.

James L. Dunn.

[Miller v. Cresson.]

The following diagrams or connected drafts of the premises were furnished, the first by the defendant, the second by the plaintiffs.

The plaintiffs then offered in evidence a certain affidavit, dated 11th of May 1829, purporting to have been signed by Jerusha Blew, James Blew, and Andrew Blew, before George Reber, Esq.; but the defendant objected until it was proved. The plaintiffs then called Charles Frailey, Esq., who testified he had seen James Blew write and knew his handwriting, and believed the signature to the affidavit to be his handwriting. The defendant still objected that it was not a conveyance—did not relate to the land in suit— was after the date of the deed under which the plaintiffs claimed, and after the deed of Levi Blew to Niel Crosby, and was irrele-

vant.  But the court admitted it as to James Blew only, it being prior to the deed to Miller, and the defendants excepted.

The paper was then read as follows:

*Schuylkill County, ss.*

Personally appeared before me the subscriber, one of the justices of the peace in and for said county, Jerusha Blew, widow of John Blew, deceased, James Blew and Andrew Blew, who being first duly sworn according to law, did depose and say: John Blew, deceased, in his lifetime, hath no claim or any other kind of right to Levi Blew's improvement, or any other of the children of said deceased, except Levi Blew himself.  It is that same tract of land situate in Norwegian township, Schuylkill county, now occupied by John Miller; adjoining lands of the York Company, land of Michael Hollenbach, and land of John C. Offerman, and others; containing 186 acres.

Sworn and subscribed before me, this 11th day of May 1829.

GEORGE REBER.                                      her

                                      JERUSHA + BLEW,
                                           mark
                                      JAMES BLEW,
                                           his
                                      ANDREW + BLEW.
                                           mark

Andrew Blew, the last signer, sworn and subscribed before me, this 11th day of May 1829.           GEORGE MEDLER,
            Justice of the Peace of Schuylkill county aforesaid.

The plaintiffs offered in evidence the deposition of Niel Crosby, taken in Londonderry, Ireland, in an action of ejectment to July term 1835, in Schuylkill county, brought by the present defendant, Anthony F. Miller, against John Schall, Samuel Brooke, John Dreher, impleaded with the present plaintiffs, the Cressons, as to whom the sheriff returned *non est inventus* and John Heist and others found in possession.  The defendant objected, but the court admitted the deposition, and a sixth exception was taken.

This deposition went to show that James Blew, in conversation with the witness in Schuylkill county, said that Levi Blew began the improvement (which the witness bought of him and conveyed to Ridgway and Schall) and built and made all the improvements that were ever made on it, and that it was Levi's, and no other's; that none of the others of his family had anything to do with it. He never said he had any claim, but always said it belonged to Levi; that James Blew signed the instrument of writing above-mentioned, relating to the tract, a day or two before the deed to Schall and Ridgway, in Squire Reber's office, and swore to it, and it was also signed by the mother and brother Andrew.  It was signed to show that Levi had the title, and to enable the witness to get his money for it from Schall and Ridgway; and witness gave it to Schall and Ridgway, with the title-papers, when he

[Miller v. Cresson.]

received his money.  He also proved the swearing by the other two, and that it was read and explained by Reber, and swore that he had no knowledge of James Blew's claiming, but that James stood out that it belonged to Levi.  ' The deposition of Patrick Crosby was also read.

The plaintiffs also proved, by George Medler, the signing of the affidavit by Andrew Blew, and then called numerous witnesses to prove the signatures, and to show the lines of the tracts, and the state of the improvement in 1821 and 1824, and that Michael Blew left his improvement in 1817 or 1818, and gave testimony by John Schall and others as to the evidence given by Kolb, and other matters.

The defendant then examined James Blew, who first stated he never received anything from the defendant on account of purchase money; that it was agreed he should, if the defendant succeeded in holding the land, have $1000 or a sixth part of the land; but he had since, on becoming a witness, released the defendant. He then stated the circumstances of the improvements by his brother; his own purchase in 1818 and Bright's afterwards; that he put Levi on the land, and afterwards Barnhart, in 1827 or 1828; that he told Niel Crosby the land was his, he had bought it; and he was asked by Crosby to sign a paper that he did not own it as an heir of his father.  He could not recollect signing the paper; thought he had not; his mother and brother signed it; thought it was Reber's handwriting.  The evidence of Andrew Blew was produced to confirm James Blew and to contradict Crosby.  The defendant also called a number of witnesses to impeach the character of Niel and Patrick Crosby for veracity.

The plaintiffs then called witnesses to support their character, and to contradict James Blew, and other evidence of James Blew on former trials.  The parol evidence was exceedingly voluminous, and embraced an endless variety of detail, on every subject, and as to every witness or person connected with the suit; much of it being obscure and contradictory; which it is needless further to insert, as the material points of the case will appear in the charge of the court below and in the opinion of this court.

The court below charged the jury as follows:

The plaintiffs claim the land in controversy by virtue of a warrant dated 4th of August 1824, to John Schall for 120 acres, adjoining lands surveyed to John Spayd, Esq., land late the property of the heirs of John Kerschner, deceased, land late of Jacob Merkle and Levi Blew's improvement, being unimproved, in Norwegian township, Schuylkill county.  9th of September 1824, survey 195 acres 77 perches, by F. Lauderbrun, deputy-surveyor, embracing the calls in the warrant.  7th April 1825, patent to John Schall, who, on the 1st of December 1828, conveyed to the Messrs Cressons.  On the deed from Schall to the Cressons you will find a release, endorsed from John Dreher and wife to the

plaintiffs. Writ served on the 15th February 1840. Here, under the direction of the court, the plaintiffs rested.

Then the defendant gave in evidence the legal title under which he claims, viz. a warrant dated 25th April 1835, to Anthony F. Miller for 400 acres, including an improvement and actual settlement, adjoining lands surveyed for John Keller, late John Kerschner, land surveyed to John Chandler, now or late Jeremiah Reed, on the east; on the north by land surveyed of George Taylor, now or late of Jacob Heim, and south-east corner of George Stitzell's improvement; on the south by Sharp Mountain; situate on Shaffer's creek, in Norwegian township, Schuylkill county. This warrant calls for interest from the 1st April 1805. On this warrant a survey was made of 414 acres and 28 perches, on the 6th May 1835, by George Rahn, deputy-surveyor. On that return of survey, Rahn states that " the improvements consist of two cleared fields, containing about 30 acres, a log-house and barn, occupied by George Runyon. The whole of the survey is claimed under different warrants above represented."

These different warrants, as appears by the return, were obtained in 1822 or '23, '24, in 1825 and in 1829. The last of these warrants is to Niel Crosby, dated on the 7th March 1829, for 180 acres. When the deputy-surveyor came to execute it, on the 14th May 1829, there were only 52 acres and 129 perches left for it of the whole vacancy. Niel Crosby got a deed from Levi Blew and wife, for the consideration of $500, on the 26th March 1829, subsequent to the warrant and prior to the survey. As this application, warrant, survey, deed and title will be more particularly brought under your consideration hereafter by the court, we will now take up the consideration of the defendant's title, which covers not only the survey of Crosby and of Schall but others not now under our immediate consideration. Although the defendant's warrant and survey is subsequent, in date, to the plaintiffs', you will bear in mind that the defendant's warrant calls for 400 acres, including an improvement. An actual settlement and its boundaries would include the land surveyed on the Schall warrant, which is for your determination. The warrant of the defendant fixes the date of the commencement of that improvement on the 1st of April 1805. Before we proceed to consider whether such settlement existed, and to enable you to apply the evidence, we instruct you that the Legislature nave defined a settlement by the Act of the 30th December 1786. They say, " It is an actual personal resident settlement, with a manifest intention of making it a place of abode, and the means of supporting a family." The Act of the 23d April 1794 closed the office against granting warrants, "except for such lands where an actual settlement has been, or shall have been made, grain raised, and a person or persons residing thereon." The office remained closed from the 22d September 1794 until the 28th March 1814, when an Act was passed repealing in

part the Act of the 22d April 1794, and also part of the Act of the 3d April 1792 as to the price, with this proviso, "that nothing herein contained shall impair or affect the right of any person who may have actually settled upon vacant land before the passing of this Act." The same Act of the 30th December 1786, which defined a settlement right, also declared that "no warrant shall issue from the Land Office of this State for any tract of land on which a settlement is made, unless to such person or persons respectively who have made the settlement, or their legal representatives, until the 10th April 1789, and if such warrant shall issue *otherwise* than as aforesaid, it shall be deemed to have issued by surprise, and shall be of no avail in law." It is true, a proviso in this Act confined it to the purchase of 1768, but its principles were extended by the courts to every part of the Commonwealth. Subsequent Acts, extending the time for patenting lands, have preserved this principle to the present day. Legal representatives were the heirs or alienee of an improver or purchaser at sheriff's sale. Warrants and surveys, and improvement rights were bound by judgments, subject to the law of descents and all their incidents of dower and curtesy like other real estate.

What then is an improvement? It is an actual resident personal settlement, a place of abode and means of supporting a family. When a man entered the forest and *bonâ fide* commenced an improvement or settlement, the law gave him a reasonable vicinage, and cast its protective shield around him. Before the revolution he was entitled to 300 acres, and since the revolution to 400 acres. He might take a less quantity; he had a right to limit and fix his boundary, and when a surveyor came to execute a subsequent warrant, he was bound to give him a reasonable vicinage and boundary, and to respect his improvement, even when he had made no actual survey of his claim. The honest settler was a favourite of the law. His residence and labour, his hardships in the woods added to the population and wealth of the Commonwealth, and when he continued to reside on the land, the Legislature gave him the same time to perfect his title to this day, that they have given to old warrant and locations with the surveys returned. You will inquire, was there an actual personal resident settlement by old John Blew or his children? This will bring to your consideration the whole evidence, and you will further inquire, was this settlement preserved by due diligence? The court will not pretend to bring all the minute evidence before you on this part of the case. They will only bring before you the prominent facts. It is your duty and province to take the whole evidence under your consideration.

The deed from Myers to John Blew is not in evidence. We submit to you whether the witnesses on both sides have not proved that old John Blew, when he first went to see it, went under the idea he had purchased the land. There is evidence that he had

v. — z *

a survey made in 1804 or 1805.   Then it was discovered that the land or part of it was vacant, and we submit to you whether John Blew and his sons or some of them did not then come to the determination of appropriating and taking it up by settlement.   Peter Starr's evidence, if believed, proves that old John Blew and his sons in 1805 used to pass his house in going and coming from Shaffer's creek to work, built a round log-house, cleared some land in a short time, some of the young Blews residing on the land. Levi lived after some time on the eastern end of the vacancy, Michael in the middle, and young John on the western end.   You have heard how James Blew built a saw-mill, and how it was continued and removed.   One of the first clearings was above or north of the saw-mill, which old field is within the survey of the plaintiffs as well as the seat where the old saw-mill stood.   You have heard how old John Blew was removed to the land about 1809, and how he died the following year.   On the —— day of ———— 1808, old John Blew conveyed the land south of the mortgage line to his sons Levi and Michael Blew.   This deed was not recorded until the 15th of April 1811.   On the 11th of January 1809, John Blew mortgaged the land, which was included in the deed to his sons Michael and Levi, to Jacob Miller to secure the payment of £157 on the 11th of January 1810, with interest.   The mortgage was defective in the courses and distances.   On this mortgage a *scire facias* issued No. 76 to August term 1811, Miller v. John Blew, James Blew, Levi Blew, Michael Blew, Isaac Blew, Andrew Blew, Mary Blew, Phoebe Blew, Sarah Blew, Jerusha Blew, Elizabeth Blew, and Eleanor Blew, children and heirs of John Blew, deceased.   The *scire facias* contained more courses and distances than the mortgage, and included the land south of the mortgage line, and said to contain 1200 acres or thereabouts.

On the 1st of August 1811, Levi Blew appeared and filed an affidavit of defence.   Evans appeared and pleaded payment.   On the 13th of August 1814, the jury found for the plaintiff £209 11s. 6d. judgment.   Sundry writs of executions issued, and in 1819 the land was sold for $1070 to David Bright.   On the 12th of April 1819, the sheriff's deed was acknowledged.   On the 11th of February 1830, David Bright conveyed to Anthony F. Miller, the defendant.   You have heard the evidence of James Blew, how he became bail for his brothers Michael and Levi Blew, and how Michael and Levi became indebted to John Hughes.   Hughes brought his suit No. 4 to December term 1817, against Levi Blew, Michael Blew, and John Adams, who was their bail.   In this action of debt on the 9th of February 1818, Hughes obtained a judgment.   A *fieri facias* issued to March term 1818, and the levy is not returned, but the inquisition states " that the rents and profits of a messuage tenement and tract of land, containing 1200 acres, more or less, adjoining George Clouser, Jeremiah Reed,

Jonathan Kerschner and others, late the estate of Levi and Michael Blew, a *venditioni exponas* to July term 1818, and land sold to James Blew for $70.50." The proceeds of this sale the sheriff returned was applied to prior judgments. On the 26th of October 1818, Sheriff Christ made his deed to James Blew, describing the land as in the inquisition, and same day deed acknowledged in open court. And on the 27th of August 1832, James Blew and wife conveyed to Anthony F. Miller for 1200 acres. You will keep in mind that the plaintiff's warrant bears date the 4th of August 1824. Survey, 9th of September 1824. Patent, 7th of April 1825. The deed to the Cressons, 1st of December 1828. 23d of January 1829, release of Dreher to the Cressons.

Levi Blew was in possession when his right was sold by the sheriff in 1818. Michael had probably left it the year before. You have heard how the improvement was kept up and continued. The court will not recapitulate the whole evidence. You will remember Barnhart's evidence. He came there (if believed) in 1810, when Michael and Levi and the old lady were on the land, and lived in the house in which the old man died. He described the improvements. Levi lived there for some years; then Isaac came, who staid two years. Levi came back after Isaac left it; after that Levi gave Hummel a lease for five years. He left it before his·time was out, and sold his lease of the improvement to John Miller. He thinks he moved in 1828. He went out and Runyon came in. The court do not pretend to recapitulate all the evidence; they submit to you Hummel's lease as produced; it is dated on the 2d day of April 1824. Application was made and the warrant issued in August 1824? You will recollect that although the house was not on the land within the Schall warrant, it was within the general survey, and was it not then claimed by James Blew under his purchase in 1818? Did Levi become the tenant of James Blew after the sheriff's sale? James swears it. Did he lease as James swears? The general principle, without an agreement, is, that if a defendant has a tenant on the land when it is sold, that tenant must pay·all the rent subsequently due to the purchaser. In fact he becomes the tenant of the purchaser to the end of his lease. If there was an existing possession and no abandonment of the improvement, then in the judgment of the court the warrant, under the Act of 1786 and 1814, would be deemed to have "issued by surprise and shall be of no avail in law." The facts we submit to you. But if on the other hand you find that James Blew had abandoned his purchase, and Levi the extent of his claim, that is, if you find there was no subsisting adverse title to the land when the warrant issued, it would not be void; and notwithstanding the irregularities urged by the defendant, the warrant would not be void. The warrant and survey would hold the land. We submit to you whether there is any evidence of abandonment prior to the year 1824.

[Miller v. Cresson.]

True, it is by the draft returned into the Land Office by the deputy-surveyor, Rahn, of the warrant of the defendant, in 1824 and prior, all the vacancy was surveyed and cut off from the Blews, except the 52 acres 129 perches which was sold to Crosby. Levi Blew, in 1829, sells to Crosby, and then the paper appears called the disclaimer. It purports to be dated on the 11th day of May 1829.

You will observe this was after the Cressons had purchased and obtained their deed from Levi Blew. The plaintiffs contend that if a person having a right to an estate permit or encourage a purchaser to buy it of another, the purchaser shall hold it against the person who has the right, although covert or under age; and the same rule prevails even where the representation is made through a mistake, if the person making it might have had notice of his right. This is all true; and if the jury find that James Blew abandoned before the Schall warrant was taken out, or if they find James Blew induced Schall to expend his money, he and those claiming under him must be postponed. But will the evidence in the cause warrant such a conclusion? You will observe and bear in mind that the disclaimer was after the Messrs Cressons had purchased and obtained their title. That paper relates more particularly to the 52 acres and 129 perches. But if the jury believe that James Blew did sign the disclaimer, it may have a strong bearing on this cause. You will bear in mind James Blew's evidence. When the disclaimer was shown to him, he said, "I have seen it before. It is my name, and looks very much like my handwriting. The 'J' is not as I commonly make my 'J's.' I have no recollection of ever signing it. I cannot think I ever signed it, because I was then standing out for my rights. My mother told me she had signed and my brother. My mother told me she was troubled about it; she thought may be it might do me some hurt. She said she was promised a new frock for signing of it. I told her if she had not signed it, I would rather have given her two. I told Andrew he ought not to have done it." On being cross-examined by the plaintiff, he says, "I do not think that I wrote my name. I do not think I ever signed it. If I did, I must forget all about it. It was when I claimed the land; don't recollect ever having been with Crosby at my father-in-law's house in the world. I have answered pretty much as I have done *here* at Allentown. When I returned home I do not recollect ever saying to Levi Reber; many talked to me about it. I said it is my name, looks like my handwriting, but I never wrote it—not as I remember." The plaintiffs then put this question to him: "I ask you again, did you not write that name yourself?" "I say I did not write it within my knowledge or knowing. I actually did not." Question: "You say now you did not write that name?" "I can say no more than I have said." "Then you will not say positively you did not write it?" "I cannot say more than I have. If I did

[Miller v. Cresson.]

write it, I must have done it without knowing what I did do. I cannot remember when or where I should have done it." "But you will not say positively that you did not write it?" "Not as I can remember. I will say positively not within my knowing."

In the trial in Schuylkill county, he was called up by the now plaintiffs. He stated on oath that "Crosby asked him whether the heirs of his father had any claim to the land. He told him they had not as I know of. Crosby told me he was about buying Levi's possession right. He told him he had no objections." He thinks an affidavit was made before Esquire Reber, that the heirs did not claim it as heirs of John Blew. You have heard how this evidence was obtained? You have heard Reber's evidence and Crosby's evidence, the evidence of handwriting, and the evidence corroborating Blew, his character, the character and credit of the witnesses. And you will determine whether James Blew did or did not execute the paper, and that he had not abandoned his improvement; then we think the defendant's title would be preferable to the plaintiffs'. But if upon the whole evidence you find that James Blew executed the disclaimer and abandoned the improvement, the land was open to any person who would take it up, and the right would be in the Cressons. Blew sold to Miller on the 27th of August 1832. The rules which should govern you in the determination of facts and in the weighing of evidence have been read to you from writers of high authority, and so fully discussed by the learned counsel on both sides that the court deem it unnecessary to discuss them. There is so much evidence, and so much contradictory swearing throughout the whole cause, that no virtuous mind can have heard it without sorrow and disgust. It is for you to determine where the truth lies, and to decide all the facts in the cause. We beg of you to consider all the evidence, as well that brought to your view by the court as that omitted which has been given in evidence.

Both parties excepted to the charge.

The rejection of the evidence in the first, and the admission of the evidence in the other five bills of exception, were assigned for error. The following errors were also assigned:

I. There was error in charging the jury, that "if on the other hand you find that James Blew had abandoned his purchase, and Levi the extent of his claim; that is, if you find there was no subsisting adverse title to the land when the warrant (of Schall) issued, it would not be void; and notwithstanding the irregularities urged by the defendant, the warrant would not be void. The warrant and survey would hold the land. We submit to you whether there is any evidence of abandonment prior to the year 1824."

II. There was error in the following passages of the charge, viz.: "The plaintiffs contend that if a person having a right to an estate permit or encourage a purchaser to buy it of another, the pur-

v. — 38

chaser shall hold it against the person who has the right, although covert or under age; and the same rule prevails even where the representation is made through a mistake, if the person making it might have had notice of his right. This is all true; and if the jury find that James Blew abandoned before the Schall warrant was taken out, or if they find that James Blew induced Schall to expend his money, he and those claiming under him must be postponed." Again: " But if the jury believe that James Blew did sign the disclaimer, it may have a strong bearing on this cause." And again: " You will determine whether James Blew did or did not execute the paper, and that he had not abandoned his improvement; then we think the defendant's title would be preferable to the plaintiffs'. But if, upon the whole evidence, you find that James Blew executed the disclaimer and abandoned the improvement, the land was open to any person who would take it up, and the right would be in the Cressons."

III. The court erred in submitting to the jury and commenting on certain portions of the testimony of James Blew, in opposition to the evidence of the plaintiffs' witnesses, without referring to or bringing the testimony of witnesses before them bearing upon the point, and corroborating the evidence of James Blew.

IV. The court should have instructed the jury as to the nature, extent and effect of the paper of the 11th May 1829, viz.:

1. That it is no conveyance, but simply a parol declaration, and therefore at most only *evidence* of abandonment.

2. That, being no conveyance, and without consideration, and procured after the title of the plaintiffs was conveyed to them by Schall, it does not enure to the benefit of the plaintiffs by retrospective operation.

3. That if James Blew was induced to sign the paper under an impression produced by the representations of Niel Crosby, or Christopher Loeser, his attorney, that it would not affect his right as a purchaser at sheriff's sale under an execution against Levi and Michael Blew as their estate, then the plaintiffs cannot avail themselves of it; more especially as it was obtained after the plaintiffs' deed and without reference to their claim, or any knowledge by James Blew of Schall's warrant and survey.

4. That if the jury believed that James Blew gave notice to Crosby and Ridgway, in the presence of Loeser and Bannan, who were acting as attorneys for Crosby and Ridgway, and afterwards for the Cressons, of his right and title to the land in question, as a purchaser at sheriff's sale, as the estate of Levi and Michael Blew, the plaintiffs cannot avail themselves of the paper so as to estop him, or those claiming under him, from setting up his prior and paramount title.

5. That if the jury believed that James Blew was imposed upon either by Crosby or Loeser and Bannan in obtaining the paper of 11th May 1829, after notice on their part of James Blew's title as

[Miller v. Cresson.]

purchaser at sheriff's sale, then the plaintiffs can derive no advantage therefrom, and must stand upon their title as it was prior to the date of said paper.

6. That James Blew might legally disclaim or abandon a part of his improvement in favour of Levi Blew or his alienee, without impairing his right to the remainder of the 400 acres to which his improvement entitled him.

7. That whilst the paper disclaims the title of John Blew and his heirs to the improvement, it at the same time asserts the title of Levi Blew, whose right was transferred by virtue of a judicial sale to James Blew, of which the plaintiffs had notice at the time of their purchase from Schall in 1828, and therefore cannot avail themselves of this parol declaration by a retrospective construction, unless James Blew had full knowledge of the title of Schall, and intended to relinquish and wholly abandon all claim and title to the 400 acres to which he was entitled by virtue of his purchase at sheriff's sale as the estate of Levi Blew.

8. That the defendant was protected by the recording Acts against the effect of the paper of 11th May 1829.

V. The charge is, in many respects, unintelligible, disconnected and erroneous, and essentially calculated to mislead the jury for want of clear and precise instructions.

The case was argued by

*Hoffman* and *J. Sergeant*, for the plaintiff in error.
*Loeser, Mallery* and *Bannan*, for the defendants in error.

The opinion of the Court was delivered by

ROGERS, J.—The defendants in error, who were plaintiffs below, gave in evidence a warrant, dated the 4th of August 1824, to John Schall, for 120 acres of land, adjoining land of John Spayd Esq. and others, and *Levi Blew's improvement.* A survey, dated 9th September 1824, for 195 acres 75 perches, and allowance patent, to John Schall, dated 7th April 1825, adjoining Levi Blew's improvement. Deed from John Schall and wife to plaintiffs, dated December 1828, and recorded 13th January 1829, with general warrant, *adjoining Levi Blew's improvement.* Release from John Dreher and wife, dated the 13th of January 1829, and recorded the same day. The warrant was founded on an application by Schall, dated the 2d of August 1824; and on an affidavit of John Kolb that the land was vacant. The warrant and survey cover the land for which the ejectment is brought. Whatever right, therefore, Schall had, is vested in the plaintiffs by the conveyances above recited.

In answer to the plaintiffs' title, the defendant gave in evidence a warrant dated the 25th of April 1835, to Anthony F. Miller, for 400 acres, including an improvement and actual settlement, adjoining lands of John Keller and others, interest calculated from the

[Miller v. Cresson.]

1st of April 1805. This warrant also covers the land, and although dated since the Schall warrant and survey, calls for an improvement, which began some time about the year 1804 or 1805, prior in date to the commencement of the plaintiffs' title. The defendant further proved that three improvements had been made by John, Michael and Levi Blew, the sons of old John Blew, which include all the vacant land amounting in the whole to upwards of 800 acres, and embracing, as cannot be reasonably contested, the land in controversy. In the year 1824, the time Schall made his survey, the land was not vacant, but was appropriated by virtue of the right acquired by the improvements and settlements as above stated. Independently, therefore, of every consideration arising from the conduct of Schall and Dreher in making the survey and in procuring the affidavit of Kolb, to which it is only necessary to advert, the warrant of the 4th of August 1824, and the survey of the same year, were entirely inoperative and of no effect, *unless evidence was given from which the jury would have the right to infer that the improvement, and particularly the improvement of Levi, was abandoned, either before or subsequently to that time.* For we distinctly recognise the doctrine of *Cresson* v. *Miller*, (2 *Watts* 276), that a warrant and survey under such circumstances is not void, although it may be avoided at the instance of the improver. Where there is a subsequent abandonment, the warrant and survey, although made on appropriated land, attaches to it, so as to validate the title of the warrantee. And of this, as we conceive, third persons cannot reasonably complain, nor is the Commonwealth injured, as they have received from the warrantee the purchase money, which is all they can reasonably require.

But, conceding these principles, it becomes material to inquire whether any and what evidence was given of an abandonment, either before or after the date of the warrant and survey. And for a spark of evidence to this effect, I have searched the testimony in vain. On the contrary, the evidence is full, clear and conclusive, that it had not the least cast of abandonment; and if the case required it, the court ought so to have instructed the jury as a matter of law. For abandonment is not in all cases a matter of fact, for it may be a conclusion of law from facts. *Cluggage* v. *Duncan*, (1 *Serg. & Rawle* 120) ; *Star* v. *Bradford*, (2 *P. R.* 384). At the time of the survey, Levi, who with Michael had acquired the interest of John Blew, and who claimed the land in his own right, or as the tenant of James, the purchaser at a sheriff's sale, was living on the land, exercising acts of ownership, cultivating it and claiming it either as owner or tenant. There is not a shadow of pretence that Levi, or any person claiming under him, ever abandoned the possession, or the title obtained by virtue of the improvement. It would be an abuse of terms to call this an abandonment, for no case has been cited where this doctrine has been applied, unless there has been actual relinquishment of the posses-

[Miller v. Cresson.]

sion. Nay, more; a man does not lose his settlement by leaving it even, for a temporary purpose, if he retains the *animo revertendi. M'Laughlin* v. *Maybury*, (4 *Yeates* 534). The title of a settler does not depend upon the extent of his improvements, but on the *animo residendi*, and the possession continued. And this would seem to be the opinion of the court, and yet this question is submitted to be determined as a fact by the jury. The language is unequivocal, for the court say, "If there was *an existing possession and no abandonment* of the improvement, then, in the judgment of the court, the warrant under the Acts of 1786 and 1814 (referring to the Schall warrant) would be deemed to have issued by surprise, and shall be of no avail in law. *The facts we submit to you.*" They then add, "But if, on the other hand, you find James Blew had abandoned his purchase (referring to the paper called a disclaimer) and Levi limited the extent of his claim, (referring, I suppose, to the survey under the Niel Crosby warrant); that is, if you believe there was no subsisting adverse title to the land when the warrant issued, it would not be void, notwithstanding the irregularities urged by the defendant. It would not be void, for the warrant and survey would hold the land. *We submit to you whether there is any evidence of abandonment prior to the year* 1824." That is, as we understand the charge, and as the jury could not avoid understanding it, they submit a fact to the jury of which there is not a particle of proof. And this, as has been repeatedly ruled, is error, and most injuriously so in a case so complicated in its details, and for this reason so difficult to make a jury comprehend. I speak irrespective of the inference which may arise from the subsequent circumscription of the boundaries, the effect of which will be noticed hereafter.

After proof of the improvement and settlement, (among other testimony, which I do not mention because I feel anxious to exclude every item of it, unless directly pertinent to points discussed in the argument), the defendant gave in evidence a judgment to December term 1817, John Hughes against Levi Blew, Michael Blew and John Addams. At the time this judgment was rendered, be it observed, Michael and Levi were the owners of the property, having acquired the improvement of John, one of the original settlers. A *fieri facias* issued to the March term 1818. There is no return of the levy on the *fieri facias*, but the inquisition states "that the rents and profits of a messuage, tenement and tract of land containing 1200 acres, more or less, adjoining George Clauser, Jeremiah Reed, Jonathan Kerschner and others, late the estate of Levi and Michael Blew : a *venditioni exponas* to July term 1818, and lands sold to James Blew for $70.50." On the 26th of October 1818, the sheriff made a deed to James Blew, describing the land as in the inquisition, and on the same day the deed was acknowledged in open court. Blew and wife, on the 27th August 1832, conveyed this property to Anthony F. Miller, the defendant.

[Miller v. Cresson.]

The inquisition and sheriff's deed describe the land with reasonable certainty, so that there is but little reason for doubt that it includes this land, embracing every part of it to which Levi and Michael had title by virtue of the improvements already mentioned. When then the survey was made on the Schall warrant, the property belonged to James Blew, and if there was nothing else in the case, this would be a very plain case in favour of the defendant.

And this leads to the most material, if not the only point in the cause, that is, has James Blew made any declaration, either written or parol, by which his title is postponed in favour of the plaintiff? or, in other words, is he or those claiming under him estopped from asserting his title? Has he concluded himself by his act or acceptance, to say the truth, has he disclaimed to have any estate in the land demanded in the ejectment? 3 *Com. D.* 487, *Disclaimer*; 4 *Com. D.* 76, *Estoppel*. The principles which are applicable to these points are settled in *Alexander* v. *Kerr*, (2 *Rawle* 93); *Crest* v. *Jack*, (3 *Watts* 238); *Hepburn* v. *M'Dowell*, (17 *Serg. & Rawle* 383); *Carr* v. *Wallace*, (7 *Watts* 401), and *Epley* v. *Witherow*, (7 *Watts* 163). As having some bearing on this point, (and it is only in this view that the evidence was admissible), the plaintiffs gave in evidence an application dated the 4th March 1829 for 180 acres, on a warrant to Niel Crosby dated 7th March 1829, founded on an application for 180 acres, whereon an actual settlement had been made, adjoining the New York and Schuylkill Coal Company and others: interest from 1st March 1804. A survey dated the 14th May 1829 for 52 acres and 129 perches. A deed from Levi Blew to Niel Crosby dated the 26th March 1829 for 180 acres. A deed dated 12th May 1829 from Niel Crosby to Thomas S. Ridgway and John Schall for —— acres. A deed dated 25th January 1830 from Thomas S. Ridgway and John Schall to the plaintiffs for three-fourths of the 52 acres 129 perches, and patent, with general warranty. A deed dated 25th January 1830 from the same to Adam Everly. And a deed dated the 23d September 1835 from Adam Everly to the plaintiffs for the one-fourth. By these several conveyances the title to the 52 acres 129 perches is vested in the plaintiffs. The admission of this testimony, which is contained in the third and fourth bills, was opposed on the ground of irrelevancy, not including the land in dispute; and this is true, as it appears by the draft that it lies west of the land for which the ejectment is brought. It, however, includes that part of it which contains the clearing and the buildings erected by Levi Blew. It is contended, that by the deed of the 26th March 1829, all the right Levi had by virtue of the improvement, including, of course, the land in controversy, was conveyed to Niel Crosby; that by the survey afterwards had on his warrant, the boundaries were circumscribed to 52 acres 129 perches, and that consequently, the warrant to Schall attached on the land, on the principle

[Miller v. Cresson.]

held in *Cresson* v. *Miller*. If the facts were as , is assumed, there would be force in the argument; but we do not perceive that Levi Blew conveys anything more than 180 acres. The conveyance is by courses and distances and adjoiners, and does not purport to convey more than a certain quantity, leaving the right to the remainder, viz. 220 acres acquired by the settlement, in himself untouched, as we apprehend on a fair construction of the deed by the conveyance. If an improver makes a settlement by which he acquires a right to 400 acres of land, (which may be bound by judgments, is subject to the law of descents and all the incidents of dower and curtesy, in the same manner as other real estate acquired either by descent or purchase), and afterwards sells a part of the tract, describing it by courses and distances and adjoiners, we cannot see how such a conveyance can devest the title to the remainder of the tract. If A obtains a title to 400 acres by settlement, and afterwards conveys to B 200 acres, which take in the buildings and the part in actual cultivation, there is nothing to prevent A from obtaining a warrant for the remaining 200 acres, on proof of the improvement on the part conveyed to B. It cannot be, that *ipso facto* by such a conveyance, the remainder, which the settler has taken special care not to convey, becomes vacant, and liable to appropriation on a warrant to a third person. It would not be just to the Commonwealth, as it may be used as a means to defraud the State of interest on the whole tract from the time of the settlement. It would be contrary to a policy long settled, which leads us to discourage all temptation to fraud. That the owner of a settlement has a right to circumscribe his boundaries is conceded; and when it is done in good faith, the residue becomes vacant and subject to appropriation in the same manner as other vacant land. But it is an entirely different question where sale is made of part only, and the *vendee* chooses to circumscribe it to a less quantity. It cannot affect the title of the settler to the residue: it requires some other act, manifesting an intention to abandon, before the land can be treated as vacant. Thus, in *Porter* v. *M'Ilroy*, (4 *Serg. & Rawle* 436), it is ruled, that taking a warrant for, and having a survey made but not returned, of a less quantity than a settler is entitled to, is not conclusive evidence of an intention to abandon the part not included; it is a circumstance which may be explained. That is a much stronger case than the present, for here the circumscription is not by the settler, but by his vendee, to whom he sold not all, but part of the tract. In the opinion of this court, therefore, there is nothing in the deed of Levi Blew or in the limitation of the boundaries, which can enure to the benefit of the plaintiffs, independently of the parol proof and the disclaimer of the 11th May 1829. It is only in connection with that paper and the parol testimony, as has been before hinted, that the evidence contained in the third and fourth bills is at all pertinent to the issue.

And this brings us to the fifth bill, which will be considered together with the fourth error. It is impossible to read the evidence, and observe the manner the cause was conducted by counsel, and the charge, without the conviction that it was understood by all concerned in the trial as turning mainly, if not altogether, on the fact whether James Blew signed the paper of the 11th May 1829. The jury could not fail so to understand it, particularly after the charge. Without examining every part of the charge, which teems with the same idea, what were the jury to understand from this language? "But, if upon the whole evidence, you find that James Blew *executed* the disclaimer *and abandoned the improvement*, the land was open to any person who would take it up, and the right would be in the Cressons." By the word "executed," the court mean "signed the paper," and therefore, we must read the paragraph thus: If, upon the whole evidence, you find that James Blew signed the disclaimer, and *thereby* abandoned the improvement, the verdict should be in favour of the plaintiff. And if we are correct in supposing this to be the tenor of the charge, it is palpably erroneous; an error for which the court is not to blame, but the parties, who appear to have been so entirely engrossed with the crimination and recrimination of each other, with the attack and defence of certain witnesses, as to have lost sight of the turning point of the case. The court have put the case on an issue only incidentally important; for granting that James Blew signed the disclaimer, (and, although this may be doubted, *we* are to take it that he did sign it after the verdict of the jury), it does not follow, as the Judge seems to have supposed, that on this concession the plaintiffs were entitled to recover. The title depends on other principles, already noticed. The paper was but an item of testimony, having, it is true, a bearing on these questions, and for this reason alone, admissible in evidence. To understand this case, particular attention must be paid to dates.

It will be remarked that the disclaimer (and I call it by that name for want of a better) is dated the 11th of May 1829; it could, therefore, as is very obvious, be no inducement to the purchaser of the Schall title on the 1st of December 1828, and on the 13th of January 1829. As regards that purchase, it cannot be pretended any person was deceived, and the only doubt is as to the title acquired by the purchase of Niel Crosby, and the subsequent conveyances by him to Schall and Ridgway, and by them to the plaintiff. Levi Blew's deed is dated the 26th of March 1829; the deed to Schall and Ridgway the 12th of May 1829, the day after the date of the disclaimer. The allegation is, that the disclaimer is part of the title, and that Schall and Ridgway, and subsequently the plaintiffs, purchased and paid for the land on the supposition that it belonged to Levi Blew. It must be recollected that Schall sold with general warranty a defective title, of which there is reason to believe he was fully aware. It became, there-

[Miller v. Cresson.]

fore, desirable to purchase the improvement, and this may serve as a key, or may be used to explain some rather extraordinary features attending this transaction. Some time before the 4th of March 1829, Niel Crosby was in treaty with Levi Blew for a purchase of *part of the tract,* viz., 180 acres, which included Levi Blew's improvement, but which did not touch the land now in contest. The deed of the 26th of March 1829 conveys the property sold, and describes it as adjoining lands of George Clauser, Stitzel's improvement, and others. From the description in the deed, the application and the survey, it manifestly appears that, although it adjoins, it does not embrace the land in the Schall warrant and survey. It cannot be pretended that Niel Crosby was deceived, for the paper was signed after his purchase. The only difficulty, in his apprehension, would seem to have been, whether the improvement was made by John Blew or by his children, John, Michael and Levi. If by the former, the property, on his death, would be equally divided among his numerous family; if by the latter, an application might be made by Levi, or by any person claiming under him. And for this purpose, whatever may have been the intention of those who obtained the paper, the defendant says the disclaimer was signed. It is in the following words:

*Schuylkill County, ss.*

Personally appeared before me the subscriber, one of the justices of the peace in and for said county, Jerusha Blew, widow of John Blew, deceased, James Blew and Andrew Blew, who being first duly sworn according to law, did depose and say: John Blew, deceased, in his lifetime, hath no claim or any other kind of right to Levi Blew's improvement, or any other of the children of said deceased, except Levi Blew himself. It is the same tract of land situate in Norwegian township, Schuylkill county, now occupied by John Miller; adjoining lands of the York Company, land of Michael Hollenbach, and the land of John C. Offerman, and others; containing 186 acres.

Sworn and subscribed before me, this 11th day of May 1829.

GEORGE REBER.　　　　　　　　　　　　her

JERUSHA + BLEW,

mark

JAMES BLEW,

his

ANDREW + BLEW.

mark.

Andrew Blew, the last signer, sworn and subscribed before me, this 11th day of May 1829.　　GEORGE MEDLER,

Justice of the Peace of Schuylkill county aforesaid.

This paper, by whatever name designated, to which the signers were sworn before a justice of the peace, a most singular and unusual procedure, is curiously obscure, (whether made designedly

so, we will not pretend to say). Strictly construed, however, it amounts to nothing more than an assertion by the signers that neither John Blew, nor any of his children, except Levi, had any interest in the land described in it, in the lifetime of John Blew. And this tallies with the testimony of Levi, James and Michael Blew, who say that the object of Niel Crosby was to get them to sign a paper that they did not own the land as heirs of their father John Blew. And this would be most likely if James, as he protests, always asserted a right to the land by virtue of the purchase at the sheriff's sale. It would, in fact, be in furtherance of his title, as he would be thereby entitled to the whole, instead of part of the land. Niel Crosby, however, says that the intention of obtaining the paper was for the purpose of enabling the witness to get his money from Schall and Ridgway, to whom, as it would seem, he had sold the land, for the same price, be it observed, he had agreed to give Levi Blew. After it was procured, he (the witness) took the paper to Orwigsburg, and gave it to Schall and Ridgway, and at the same time received his money.

Adopting this version of the affair, it becomes very material to inquire what land Crosby purchased from Levi Blew, the title to which Schall and Ridgway wished to be assured of by a declaration under oath that it was the property of Levi, and was not claimed by James and the other children as the heirs of old John Blew. And about the identity of the land there is no difficulty, whether we refer to the deed of Levi Blew to Crosby, or the description contained in the disclaimer itself. Both refer to property containing in quantity 180 acres, bounded by Offerman, Hollenbach and others, and which by the draft, it appears, adjoins but does not include this land. If Schall and Ridgway, or the Cressons, who have succeeded to their right, get all Crosby purchased from Levi Blew, in what respect are they injured? They surely cannot, with any show of justice, complain that they are not permitted, by a forced inference and construction of a paper at least ambiguous, to acquire a title to land which they never purchased, and for which they never paid. The limitation of their right afterwards cannot extend their claim, for, if entitled at all, it is at the time of their purchase from Crosby. And this consequence would follow even if the paper was held to be a deed, grant or contract for the sale of land by James Blew himself, for it cannot be extended beyond the subject-matter of the grant. Much less can the declaration of James be extended further than as a disclaimer as to any title to the land which his brother was about to convey to Crosby, viz., 180 acres. It is not a legal disclaimer, or legal estoppel, nor is it a contract binding on him, as it is very certain he never received a single cent as consideration. James Blew cannot be concluded from saying the truth, unless it is clearly shown that to permit him to do so would operate as a fraud upon some third person, who has been induced, on the faith of his act

[Miller v. Cresson.]

or declaration, to purchase the land, or to expend money upon it. The sheriff's title was a record, of which of course all persons—Ridgway, Schall and the Cressons among others—had notice; and having notice, the only question is, whether Schall, Ridgway and the Cressons, acting with ordinary diligence and prudence, were deceived by any act or declaration of James Blew. We cannot say that the court was wrong in admitting the testimony contained in the 3d, 4th and 5th bills, in connection with each other, because they have a bearing as introductory to the principal point in the cause, as before indicated. We are, however, of the opinion that they erred in giving an effect to the paper to which it is by no means entitled. It will be observed that I have carefully avoided noticing any of the facts but such as have a direct bearing on the points raised in *this* court.

Having taken a general view of the cause, I will now notice some other exceptions to testimony. We think the court was right, on the authority of *Kerns* v. *Swope*, (2 *Watts* 75); *Cresson* v. *Miller*, (2 *Watts* 273); and *Epley* v. *Witherow*, (7 *Watts* 163), in refusing to admit the testimony of Jacob Seitzinger. But we are of opinion that there was error in admitting the title of John Blew, because it was irrelevant, and therefore incompetent. Neither party claim under John Blew, as it is conceded on all sides that the settlement was made by John, Michael and Levi. It is a matter of some consequence, that, in a case so complicated, care should be taken to exclude all irrelevant matter. The exception taken in the 6th bill has not been pressed, nor can it be with the least prospect of success.

Judgment reversed, and a *venire de novo* awarded.