## Cresson *against* Miller.

The title of an innocent purchaser of land, without notice, is not affected by proof of the censurable or even criminal conduct of those who executed the warrant upon which the land was surveyed. Notice of the claim of an equitable owner must be actual; or clear unequivocal possession, which amounts to legal notice.

In Pennsylvania the rule does not prevail, that a conveyance, by one who is not in the possession of land, and which is held adversely by another, is void.

No presumption of a knowledge of defect of title arises from the fact of the purchaser having received a deed containing a general warranty of title.

The fact that land was improved at the date of an application will not render the warrant void, but only voidable at the instance of the improver; and if such improver relinquish his claim, the right of the warrant holder becomes indefeasible.

[Cresson v. Miller.]

ERROR to the common pleas of *Schuylkill* county.

This was an action of ejectment by James Cresson and others, against John Miller and others, for fifty acres of land; the facts of the case necessary to an understanding of all the questions of law which arose, are fully stated by his honour who delivered the opinion of the court. The cause was argued by

*Porter*, for plaintiff in error.
*Bannon*, for defendant in error.

The opinion of the Court was delivered by

Rogers, J.—This is an action of ejectment for fifty acres of land. The plaintiff gave in evidence a warrant, dated the 4th of August 1824, to John Schall, for one hundred and twenty acres, adjoining lands surveyed to John Spayd, Esq. et al., and Levi Blue's improvement. The land is described in the warrrant as unimproved, and situated in Norwegian township. A survey, dated the 9th of September 1824, for one hundred and ninety-five acres and seventy-six perches, adjoining lands late of Jacob Merkle et al. and Levi Blue's improvement. A patent, dated the 7th of April 1825, for the same property, to John Schall. , And a deed, dated the 1st of December 1828, John Schall and wife to the plaintiff, conveying, for the consideration of 1656 dollars, one hundred and ninety-five acres and seventy-six perches, and allowance as described in the patent. The fifty acres for which this suit is brought, is part of the land contained in the patent. This, therefore, vested in the plaintiffs a *prima facie* title to the land. The defendants proved that the plaintiff's survey was made by a certain John Dreher, who acted as the agent of Lauderbrun, who was the deputy surveyor; that Dreher was interested in the survey, as appeared by a release, dated the 13th of January 1829, indorsed on plaintiff's deed. They also proved by John Kolb, that Dreher induced him to make oath that the land was unimproved; that at the time he made the *affidavit* he knew nothing about the land, but relied altogether on the representations of Dreher. That John Schall was present when the survey was made, and was the axe-man; and that the witness and Amos Dreher, son of John Dreher, aged about seventeen years, carried the chain, and that neither of them was sworn. The defendants insisted, on this state of facts, that the plaintiffs were not entitled to recover, and submitted no less than twenty-one propositions to the court, the answers to which are now assigned for error. The practice of splitting up points has, on repeated occasions, been censured by the court, and cannot be too much condemned. My respect for the profession forbids my harbouring the suspicion that this course is persisted in with a view to confuse and perplex courts. It is, however, certain, that this is the effect produced by the practice now adverted to. One of the principal difficulties which we have encountered, in understanding the case under review, arises from the manner the points were pre-

II.—KK

[Cresson v. Miller.]

sented to the common pleas, and to this court. The court of common pleas took a general view of the whole cause. The merits of the case were examined by them, and were presented to the jury in a clear and forcible manner. There was no necessity, for purposes of elucidation, to give a detailed answer to each proposition. The general answer which the court gave, was all that, with any propriety, could be required. Indeed any other course would have tended to perplex the jury. And this leads to examine whether the court were in error, in their charge to the jury, on this part of the case. And on this point we are of the opinion, that however censurable, or even criminal, the conduct of the actors in the survey may have been, that cannot affect the title of the plaintiffs. If all that the witness testifies be true to the letter (and the circumstance disclosed shows the danger of relying on such testimony), it cannot be used to defeat the plaintiffs' title, if they were *bona fide* purchasers without notice. The plaintiffs had shown a warrant, survey and patent to Schall, and all the purchaser was bound to do was, to see that the application had been such as was required by law; and that a survey had been made and returned by the proper officer, and that it had been marked on the ground. It must be borne in mind, that the court do not take from the jury the decision of the fact, whether the Cressons were *bona fide* purchasers without notice. This fact was distinctly referred to the jury, and has been declared by them in favour of the plaintiff; and I do not perceive how they could have decided otherwise. There is nothing on the face of the title which leads to a knowledge of the facts on which the defendants rely to defeat the plaintiffs' title. The testimony shows that the land was unimproved, although it appears that Kolb was not aware of this when he made the *affidavit*. Nor could the purchasers have known that the chain-carriers were not sworn. If the title of a *bona fide* purchaser could be defeated by such testimony, no man's title would be safe. But this cannot be, for all the purchaser has to do is to look to the written muniments of title. But it is said there was enough appeared to put the purchaser on inquiry: but of whom was he to inquire? surely he was not bound to suspect that the witness had committed perjury, and to inquire of him and others whether that was the fact. If he had inquired of Miller, he would have been informed by him that he claimed title to the land, of which it is probable he was aware, and that he also knew that Miller had no title.

There is no pretence to say that the plaintiff had actual notice. There is nothing which appears in the testimony from which the jury would have a right to infer knowledge of the material facts on which the defendants rely. And legal notice exists only when there is a violent presumption of actual notice. When there has been an undisturbed possession by the equitable owner, it has been considered as legal notice; but it must be a clear unequivocal possession. Billington *v.* Welsh, 5 *Binn.* 129. Equity has always been careful

[*Cresson v. Miller.*]

not to impeach the title of purchasers by presumptive notice.   2 *Vern.* 159.   The undisturbed possession of land has generally been considered as legal notice, because the fact of possession being notorious, it is sufficient to put the purchaser on his guard, and to induce him to inquire into the title of the possessor.   But to entitle the bare possession to such weight, it ought to be a clear unequivocal possession.   5 *Binn.* 132.   At the time of the purchase, Henry Humnel lived on Blue's improvement under a lease from Blue.   An inquiry of him would have produced nothing, as it is not shown, but the contrary, that he knew any thing of the improper conduct of Schall, Dreher and Kolb.   The survey was made without the privity of Humnel; and, so far as we know, without the knowledge of any person except those who were immediately engaged in it.

In England, and some of our sister states, there is a check to the power of alienation of a right or interest in land, taken from the statute of 32 *Hen.* 8, *ch.* 9, against selling pretended titles; and a pretended title, as is said by Montague, C. J., in Partridge *v.* Strange, 1 *Plow. Rep.* 88, within the purview of the common law, is when one person lays claim to land of which another is in possession, holding adversely to the claim.   Every grant of land, except a release, is void, if at the time the lands are in the actual possession of another person claiming under a title adverse to that of the grantor.   It is admitted that the doctrine, that a conveyance by a party out of possession of land and which is held adversely by another is void, does not prevail in Pennsylvania; yet it is contended, that such a state of things requires great vigilance on the part of the vendee; and that it is his duty to make inquiries which, under different circumstances, he would not be compelled to make.   All vendees are bound to take notice of what is contained on the records of the county, or on the written muniments of title; but they are not bound to seek for secret incumbrances or equities.   The law does not favour secret equities; and it has been the anxious care of the legislature, that the titles to real estate should appear in writing.   But even if the law is as is supposed, yet I cannot perceive how, by any reasonable diligence, the vendee could have arrived at a knowledge of the facts, that Kolb has undertaken to swear without knowledge, or that the chain-carriers were not sworn.

The deed from Schall and wife to the plaintiff contains a general warranty, and from this an argument has been drawn which I have heard urged for the first time.

It is said, that such a purchaser is not protected, or, in other words, that he is not a purchaser without notice.   I have looked into the cases, and I cannot find a trace of such a distinction; it has also escaped the research of the learned counsel; and it seems to me that it is as unsupported by reason and policy, as by authority. Secret incumbrances and liens often arise from negligence, and sometimes from design.   If, therefore, a loss arises, it should fall on him by whose act or negligence it was occasioned.   Frequently

[Cresson v. Miller.]

general warranties are taken *ex abundante cautela,* and not because the purchaser had the least reason to suspect that the title was defective.   A purchaser taking a deed with a general warranty, forms not the slightest presumption that the title he received was doubtful, or that he knew it to be such.   The idea seems to be, that if he fails to recover the land, he has his remedy over against the vendor ; and that, therefore, he can be in no better situation than the vendor.   It is apparent, however, that in a great majority of instances, a vendee cannot obtain adequate relief.   Without *insisting upon* the occasional insolvency of the vendor, he cannot be compensated for the increased value of the land, arising from his industry and skill, or from the employment of his capital in erecting valuable improvements on the premises.   It is right, therefore, that the loss, if any, should fall on him whose neglect has occasioned it.

But the plaintiff in error further contends, that the court erred in their answer to the sixth point—"that no warrant can legally issue for land improved and occupied by another."

It is said this land was improved when Schall took out his warrant, and for that reason the warrant and survey under it were void. It was not void even if the land or part of it was improved.   It was voidable, at the instance of the improver, for so much land included in the warrant as the improver was entitled to.   If the improver relinquished his claim, the title of the warrant holder became indefeasible.   The object of the law is to protect, as well the interest of the improver, as to reserve to the commonwealth its interest from the date of the improvement.   The improver may abandon his improvement when he pleases ; and then any one may purchase the land from the commonwealth, and in such case is only required to pay interest from the date of his application.   The object of the law is attained by leaving the improver to control the claim of the warrant holder.   In this direction we discover no error.

There cannot be a doubt but that Levi Blue, and those *claiming* under him, had a right to circumscribe the boundary of his improvement, so as not to include the land in question.   If Levi Blue, or Crosby who succeeded to his rights, had *so willed,* it would seem, from the evidence, that they might have embraced this land.   But this they did not think proper to do.   Blue sold his improvement to Crosby, who had a survey made excluding this land.   Who then has a right to complain of this transaction?   Not Crosby, for he has abandoned his right ; not the commonwealth, who have treated the land as vacated, and who are not in any way a loser by this arrangement.   Surely it does not lie in the mouth of a third person to take this defence, and in this way defeat the commonwealth's vendee.

This disposes of the objection to the plaintiffs' title.   The defendants allege that they have a title, or at any rate that there is a title outstanding, better than the plaintiffs'.   There is no principle better settled, than that a plaintiff must recover by the strength of his own title ; and if the case is as stated, the plaintiffs cannot

[Cresson v. Miller.]

recover. The defendants gave in evidence a warrant, dated the 18th of November 1793, to Conrad Feger for four hundred acres; a survey dated June 28th 1794, returned 24th of February 1795; a survey dated 17th of June 1794; a warrant to John Spayd, Esq. for four hundred acres dated 18th of November 1793, and a survey thereon dated 17th of June 1794; and a warrant to Charles Evans for four hundred acres, and a survey on the same day as above. They also gave in evidence an old purchase voucher, No. 11,687, November 18th 1793, Colonel Moyer, fifty warrants of four hundred acres, twenty thousand acres; a deed dated June 11th 1804, John Moyer to John Blue, for the consideration of 60 pounds conveying all his right to and out of a certain tract, parcel or piece of land situate in Norwegian township, &c., bounded, &c. &c.

Deed dated in 1808. John Blue, Sen. to Levi Blue and Michael Blue, his sons, in consideration of 150 pounds conveying a tract of land in Norwegian township. Also another tract of land situate in the same township, being three adjoining tracts of land originally surveyed unto Charles Evans, John Spayd and Conrad Feger, which they respectively conveyed to John Moyer, and which he conveyed to John Blue. A mortgage dated January 11th 1809, John Blue to Jacob Miller, conditioned for the payment of 157 dollars the 11th of January next with interest, granting a messuage, tenement and tract of land in Norwegian township, containing by metes and bounds twelve hundred acres or thereabouts. The record of a suit, No. 76, August term 1811, on said mortgage, Jacob Miller v. John Blue, James Blue, Levi Blue, Michael Blue et al., children and heirs of John Blue deceased, in which there was a verdict for the plaintiffs on the 12th of August 1814.

A record of a *scire facias sur* judgment, to August term 1817, No. 191. The executions thereon, by virtue of which the premises were sold to David Bright for 1070 dollars. Deed dated 12th of April 1819, John Miller, sheriff, to David Bright, for the land described in the mortgage, duly acknowledged. Deed dated 11th of February 1830, David Bright and wife to William Fricker and Anthony F. Miller, for the consideration of 3000 dollars, for the moiety of said tract of land.

The defendant also gave in evidence the record of a suit, John Hughes v. Levi Blue, Michael Blue and John Adams, &c., No. 4, December term 1817, and the executions issued thereupon, by virtue of which certain premises hereafter described were sold to James Blue for 70 dollars and 50 cents. Deed dated 26th of October 1818, Benjamin Christ, sheriff, to James Blue, for a messuage and tract of land in Norwegian township, adjoining lands of Green, Klauser et al., late the estate of Levi Blue and Michael Blue. Deed dated 27th of August 1832, James Blue and wife to Anthony F. Miller, for the same land, and by the same description.

Whether the three warrants to Evans, Spayd and Feger were located on the land in dispute, was a fact distinctly referred by the

[Cresson v. Miller.]

court, with an express direction, that if they covered the premises the plaintiff could not recover, no matter to whom they now belong. And this surely was as much as the defendants had a right to require. The court further say, that if these warrants were not located on the land, the defendants have no pretence to say that they are protected by the act of limitations. And in this there was no error; because, if the land was not included in the warrants referred to, nor embraced by John Blue's improvement, which was also distinctly referred as a fact to the jury, the land was vacant, which leaves no pretence to claim the land by virtue of the act of limitations. The defendants alleged that John Blue entered on the land under mistake, supposing it to be embraced in the three warrants; in which case, they say he may hold as an improver. If the mistake had existed, as alleged, in the absence of all allegation of fraud, as was the case of this, there can be but little doubt he might have held as an improver. The evidence however distinctly shows, that John Blue never did improve the land in controversy. He held the title to the three warrants which laid on lands adjoining the fifty acres, and he himself resided on another tract some distance off, which he claimed by virtue of an improvement. Whether an improvement can be made on two tracts, it is unnecessary to decide. There is nothing here to raise the question. It appears from the testimony of Levi Blue, that he made the improvement in question for himself, and not for his father; and that he afterwards sold the improvement to Neil Crosby, who afterwards, as before stated, made a survey, throwing out the fifty acres in dispute. Levi Blue says, that a year or two after the sheriff's sale, Miller and Christ stopped at his house and asked him to show them the lines; he showed them the lines that were surveyed to his father. Miller seemed dissatisfied, and said the house was on it, that it went further towards the hill. Witness told him that was the land surveyed to his father; and the other witness said he held by possession, and that he was not willing to give it up. Miller said he had bought it and would have it. Witness said he should not have it without he gave him something for his improvement right. Miller said he would not do it. Blue was the defendants' witness.

But the defendants say the court erred in the answer to the seventh point—" that a levy on a messuage and tract of land, and a sale thereof by the sheriff, vest all the legal and equitable interest of the person, as whose estate the land was sold in the sheriff's vendue." As an abstract proposition, the position of the defendant's counsel cannot be denied; but still, I cannot discover any error in the answer of the court. In 1808 John Blue mortgaged the property which he purchased of John Moyer, to Jacob Miller. About the same time he conveyed part of the property to his sons, Levi and Michael; Jacob Miller brought suit upon the mortgage, against John Blue, James Blue, Levi Blue, and Michael Blue, children and heirs of John Blue deceased, and obtained a verdict. This mortgage covered the whole land, and included the property conveyed

[Cresson v. Miller.]

by John Blue to his sons Levi Blue and Michael Blue.    A suit was brought, John Hughes *v.* Levi Blue, Michael Blue and John Adams, and executions issued thereon, by which the property was sold to James Blue.    If the levy was not made on Levi Blue's improvement, then the property was still in Levi Blue, who afterwards sold to Crosby, who surveyed the land, excluding the fifty acres.    But if it did include it, it was sold to James Blue.    The case shows, that in 1829 Levi sold his improvement to Crosby, and that then some question was made about Levi's title.    Crosby and Levi Blue called on James Blue, and informed him that Crosby had bought, or was about to buy Levi's improvement ; and told him, that they had come to inquire about Levi's title ; and he inquired whether the heirs of John Blue claimed it.    James said, he knew none of them had any interest in it.    That Levi had staid so long on it, he thought he ought to have it.    James did not claim any interest in the land, although this conversation was after his purchase at the sheriff's sale.    This being the case, he could clearly have no right as against Crosby, who came to him for the express purpose of inquiring whether he or the other heirs of John Blue had any title to the land which he was about to purchase from his brother Levi.    The court were right in this part of the charge ; and also in stating, that the defendants could be in no better situation than James Blue, from whom they purchased.

This disposes of all the exceptions to the charge ; and it remains now to examine whether there is error in the admission of certain evidence to which the defendant excepted.

One of the objections to the evidence in the first two bills of exceptions is, that it is irrelevant.    It is undoubtedly error to admit irrelevant testimony.    But was the testimony irrelevant ?    We think it was not.    The defendants, after adducing the evidence to which I have particularly adverted, gave in evidence, that they had paid the taxes ; the plaintiffs then, to rebut this testimony, offered in evidence the testimony stated in the bill, for the purpose of proving that the surveys were vested in Charles Snowden ; and that he was assessed with the taxes and paid them.    For these purposes they were evidence.    Although the evidence was of but little importance, yet we will not reverse for that cause.

The plaintiffs then afterwards read in evidence the sheriff's deed, dated the 9th of August 1810, George Marx, sheriff, to Charles Snowden ; also an application by Crosby for the land on which Levi Blue had made his improvement.    The remarks which have already been made, in connection with the survey made by Crosby, show the importance of this testimony.    It was clearly not error to admit it.

The plaintiffs then read the record of a deed, dated the 20th March 1829, from Levi Blue and wife to Niel Crosby, for the consideration of 500 dollars, for a messuage tenement and improvement ; the application of Niel Crosby, dated the 4th of March 1829 ; a warrant, dated the 7th of March 1829, to Niel Crosby.    The plaintiffs then offer in evidence an application, warrant and survey of a tract of land

on Muddy creek. This evidence was offered for the purpose of showing, and in this point of view we think it admissible, that from 1804 to June 1829, John Blue was not living on the land in dispute, but had another settlement. It must be recollected that the defendant endeavoured to hold this land by virtue of an improvement made by old John Blue. It was therefore testimony, independent of the question whether a man can hold two tracts by settlement, which had some bearing on that question of fact. The weight of it is immaterial. It is for us to inquire into its competency merely. It was entitled to some weight in connection with the testimony of Levi, who swears positively that he and his brothers made the improvement, and that his father never laid any claim to the part thus settled. It was outside of Moyer's survey, which they knew at the time they made it, and which they believe the father knew also.

In the further prosecution of the examination of Levi Blue, the plaintiffs proposed to ask the witness what was said by James, and what was the reason he was applied to. The answer of the witness shows the pertinency of the testimony, which was necessary as an explanation of the testimony previously given. The witness had sworn that he and Crosby had called on James, and the reason Crosby gave to James was, that Mr Loeser and Lauderbun would not give him a right to the land he had purchased from Levi, because, they said, his brothers and sisters had a right to it. In answer to which, James made the declaration which has been heretofore mentioned.

Judgment affirmed.