## Celinda Gray vs. Coe Durland.

This case is reported *ante p.* 100. The following dissenting opinion of Justice Hogeboom, was not received by the Reporter in time to be printed in connection with the prevailing opinion.

Hogeboom, J. (dissenting.) The defendant upon affidavits, a case and exceptions, appeals from an order made at special term, denying a new trial for the admission of improper evidence, for a refusal to nonsuit, and an erroneous charge, and for a refusal to set aside the verdict as being against the weight of evidence, and on the ground of surprise.

1. I think there was no error in allowing the plaintiff to prove of whom her family consisted.   It was one of the circumstances of the case — might throw light upon its history — was connected with the main fact of confinement and loss of service, might in some degree tend to show the nature, extent and value of the service — shows the number and situation of the family itself, and could not, I think, have in anywise prejudiced the defendant.

2. I think the evidence of the daughter having taken poison at the instance of the defendant was properly admitted.   It was a circumstance to show his conviction of his own guilt, and his attempt to remove the evidence of his own misconduct.   It would naturally and justly have some weight with the jury in satisfying them that the defendant dreaded exposure and wished to produce an abortion to protect himself.   I do not think it was objected to as to its mere *effects* upon the health or condition of the girl with sufficient clearness and precision separated from other admissible matter, and distinct from other untenable objections, to make the admission of the evidence erroneous on that account.   Even if adequately objected to, I incline to think the evidence of the effect of the poison proper as connected with the leading fact of seduction, and collateral to it, and as one of those consequences growing out of the seduction, and, the defendant's conduct in reference to it which makes the defendant properly responsible for it in this action.   Evidence of a nearly similar character has been admitted in several cases.   (*See Hewit* v. *Prime*, 21 *Wend.* 79 ; *Knight* v. *Wilcox*, 15 *Barb.* 279 ; *Johnson* v. *Jenkins*, 24 *N. Y. Rep.* 254 ; *Dain* v. *Wyckoff*, 18 *id.* 46 ; *Manvell* v. *Thomson*, 2 *Carr. & Payne*, 303.)

3. Whatever objection there might be to the question "what did you see in his manner and conduct" as calling for an opinion of the witness, was rendered of no moment, by the answer of the witness, which was confined entirely to *facts*, and to facts pertinent to the case.   It was, "He

Gray v. Durland.

would go and talk to her in a low tone ; he stood and looked at her ; he had nothing to say to me ; " which were all circumstances more or less suspicious, and were fit for the consideration of the jury.

4. The question to the plaintiff, " Has Amanda been dependent upon you for support ?" was proper. It tended to show the expenses to which the plaintiff had been subjected, and perhaps the relation of mistress and servant between the mother and daughter.

5. I am inclined to think the motion for a nonsuit was properly denied, independent of the legal question involved, upon the ground that as a question of fact there was sufficient evidence to go to the jury upon the point whether the actual relation of mistress and servant did not exist between the mother and daughter, at the time of the alleged seduction.

6. The embarrassing question in the case arises under the charge of the judge to the jury, that the plaintiff was entitled to recover if the daughter was a minor at the time of the alleged seduction, whether in her service or not ; in other words, that after the death of the father, the mother is entitled to the services of the minor children, so as to constitute the constructive relation of mistress and servant.

It has been supposed by the plaintiff, that the evidence is so clear, that at the time of the alleged seduction, the daughter was in the *actual* service of the mother, that even if the charge were in law erroneous, it would not furnish ground for a new trial, because the point involved in it did not arise, and therefore the error was not prejudicial.

But I am not able to reach that conclusion on the question of fact. The girl swears to *three* different occasions when the defendant had intercourse with her ; the *first* at the defendant's own house, in September, 1863, when she was in his service ; the *second* time in October, 1863, after she had left the defendant's service and was living with her mother ; the *third* time in January, 1864, while or after she

·was in the service of Davis, and had gone home to her mother's at the latter's request to assist in taking care of a sick child, she returning to Davis the next day after.

If the seduction be claimed to have taken place on the *first* occasion — and it has been held that proof of pregnancy and the birth of a child are not essential, (*Knight* v. *Wilcox,* 18 *Barb.* 212 ; *White* v. *Nellis,* 31 *Barb.* 279, 282 ; *Boyle* v. *Brandon,* 13 *Mees. & Welsb.* 738 ;) then it was accomplished during her actual service with the defendant ; if in fact on the *second* occasion, then it was while in her mother's ·service ; if on the *third* occasion, which most probably was the intercourse which produced pregnancy, because the intervening period between it and the birth of the child corresponded with the ordinary period of gestation, then it left perhaps a question for the jury to determine whether *at that time* she was in the service of Davis or her mother. It was while she was actually at home assisting her mother ; it was also after she had gone into the service of Davis, and · though temporarily absent was expecting to return there as she in fact did on the next day. If her period of service with Davis was not ended and her wages continued there, then she was probably still in legal contemplation in the service of Davis. There seems to have been a question of fact on this point for the jury to determine. (*Ingersoll* v. *Jones,* 5 *Barb.* 661.)

I think, therefore, we must meet the broad question whether after the father's death the mother is entitled to the services of the minor children.

*Sargent* v. *Denniston,* (5 *Cowen,* 106,) is generally supposed to have in effect decided that question in favor of the right of the mother, and yet it was not decided on that ground, but mainly on the ground that where the expenses consequent upon the seduction fall upon the parent, (of whichever sex,) the action is maintainable. Judge Sutherland says, (*p.* 117,) "It cannot, therefore, be necessary according to the theory or just principles by which this

Gray *v.* Durland.

action is regulated that the parent, in order to sustain it, *should be entitled to the services of the daughter, at the very instant when the act is committed,* which subsequently results in a loss of service or necessary pecuniary disbursements." The contrary principle is now generally conceded to be the law, and that it is necessary that the parent should be *entitled* to the services of the daughter at the time of the seduction. The question of title to the services on the part of the mother was not discussed ; and if it had been, however valuable the discussion might have been, the case would not have been a controlling authority by reason of the fact that the outstanding indentures by which the child was found out to a third person, stood directly in the way of a truthful assertion of the fact that the mother was at the time entitled to the services.

The same difficulty arises in maintaining the authority of *Bartley* v. *Richtmyer,* (4 *Comst.* 38,) for the opposite position, that the mother is not entitled, after the death of the father, to the services of the minor children, to wit, that the point did not arise. The action was by the *step-father,* who was clearly not entitled to her services, and the seduction occurred while the female was in the service of the defendant's father. The case was, therefore, rightly decided upon another ground, and cannot be insisted on as a binding authority for the defendant's position. Still the question now before us was largely and learnedly discussed, and after a very full citation of authorities, and when so able a jurist as the late Chief Justice Bronson pronounces the opinion, that "at the common law the mother has not, like the father, a legal right to the services of a minor child, and there is, consequently, no ground for implying the relation of master and servant between them," we may well pause before arriving at a contrary conclusion. The Pennsylvania cases of *South* v. *Denniston,* (2 *Watts,* 474,) and *Logan* v. *Murray,* (6 *Serg. & Rawle,* 175,) and the English case of *Davies* v. *Williams,* 10 *Ad. & Ellis, N. S.* 725,) were cited by him as sustaining the posi-

tion that the mother was not entitled to those services ; and the New Jersey case of *Coon* v. *Maffett,* (2 *Pennington,* 583,) as countenancing the opposite doctrine, though it was not the point in judgment. An additional Pennsylvania case, adverse to the mother's right, is to be found in *The Commonwealth* v. *Murray,* (4 *Binney,* 488,) though that was not an action for seduction, but a case arising on *habeas corpus.* The case of *Roberts* v. *Connelly,* (14 *Alabama Rep.* 235,) is to the same effect. The tendency of the Pennsylvania cases is adverse to the mother's right. *Coon* v. *Maffett,* (2 *Penn. Rep.* 503,) is cited as maintaining the opposite doctrine ; but I think the question of *right* to service did not arise, but the case was decided on the ground of *actual* service, although it was held that the service need not be at the time of seduction (which might even occur in the father's lifetime,) but might be afterwards. The tendency of the New Jersey cases seems to be in favor of the mother's right. A recent case is cited by the defendant's counsel, reviewing the previous cases and announcing the conclusion that the widow is entitled to the services of her minor children. (*See Osborn* v. *Dutcher,* 2 *Dutcher N. J. Rep.* 388, 391 ; *Campbell* v. *Campbell,* 3 *Stockton, N. J. Rep.* 268,) which says : " Generally, upon the father's death, the mother, as the natural guardian, is entitled to the earnings of her children during their minority.

Some Massachusetts cases tend in the same direction, though in all the question does not appear to have been directly involved. (*See Nightingale* v. *Withington,* 15 *Mass. Rep.* 272, 274 ; *Dedham* v. *Natick,* 16 *id.* 135, 140.) See also the following cases in other states, bearing on the question : *Jenness* v. *Emerson,* (15 *New Hampshire Rep.* 486 ;) *Graham* v. *Kaider,* (11 *B. Monroe, Ky.* 60 ;) *Jones* v. *Tedis,* 4 *Littell, Ky.* 25 ;) *Kelly* v. *Donnelly,* (5 *Maryland Rep.* 211 ;) *Villepine* v. *Shular,* (1 *Strobhart, S. C.* 462,) in some of which intimations are thrown out favorable to the mother's authority, the question does not appear to have

Gray *v.* Durland.

directly arisen. This last case is only authority for the position that the mother may bring an action for the seduction of a daughter over twenty-one years of age, if living with her in actual service.

In our own state the plaintiff relies upon *Mulvehall* v. *Millward*, (1 *Kern.* 343 ;) *Sargent* v. *Denniston*, (5 *Cowen*, 106 ;) *Martin* v. *Payne*, (9 *John.* 387 ;) *Ingersoll* v. *Jones*, (5 *Barb.* 661, 665 ;) *Clark* v. *Fitch*, (2 *Wend.* 459 ;) *Dain* v. *Wyckoff*, (18 *N. Y. Rep.* 45 ;) *White* v. *Nellis*, (31 *id.* 405 ;) *In re Ryder*, (11 *Paige*, 185 ;) 2 *Kent's Com.* 190, 205 ; *Reeve's Domestic Relations*, 426, 7, 8, *and notes, ed. of* 1862.

*Mulvehall* v. *Millward*, (1 *Kern.* 343,) was an action by the *father*, and not the mother. So also was *Martin* v. *Payne*, (9 *John.* 387.) So also was the case of *Clark* v. *Fitch*, (2 *Wend.* 459.) So also was the case of *Dain* v. *Wyckoff*, (18 *N. Y. Rep.* 45.) So also was *White* v. *Nellis*, (31 *id.* 405.)

In *Ingersoll* v. *Jones*, (5 *Barb.* 611,) the plaintiff was neither the father nor the mother ; but a third person, who claimed to stand *in loco parentis*. The seduction took place while the girl was in the actual service of a third person, and the authority of the case is, I think, justly questioned on that ground in the case of *Bartley* v. *Richtmyer*, (4 *Comst.* 47.)

In *re Ryder*, (11 *Paige*, 185,) the question did not precisely arise, and the chancellor disclaimed any authority to compel the mother (the father being dead) to furnish her infant son the means of obtaining a professional education, which was the relief sought for. The chancellor employed this language, (*p.* 187 :) "A *parent* who has the means, is undoubtedly bound to support his *or her* minor child, that is, to afford the child a bare support. The law, however, gives to the parent a corresponding *right* to the *services* of the child, *while such support is afforded.*" No authority is cited, nor is the question considered, whether there is any

distinction between the father and the mother, as to the right to the service.

The citation to 2 *Kent's Com.* 190, supports the proposition, that to a qualified extent, both the father and mother are by the statute law (1 *R. S.* 614) charged with the obligation of supporting their minor children, but the author (*p.* 191) draws a distinction between the parents, in this respect, at the common law, in these words : " The father is bound to support his minor children if he be of ability, even though they have property of their own ; but this obligation in such a case *does not extend to the mother,* and the rule as to the father has become relaxed ;" citing *Hughes* v. *Hughes,* (1 *Bro. Rep.* 387 ;) *Pulsford* v. *Hunter,* (2 *id.* 416 ;) *Haley* v. *Bannister,* (4 *Madd. Ch. Rep.* 146 ;) *Whipple* v. *Dow,* (2 *Mass. Rep.* 415 ;) *Dawes* v. *Howard,* (4 *id.* 97.)

This author also says, (*p.* 193 :) " And in *consequence* of the obligation of the father to provide for the maintenance, and in some qualified degree for the education of his infant children, he is entitled to the *custody* of their persons, and to the *value of their labor and services."* He proceeds to argue that there is no doubt as to this right on the part of the father until the child becomes fourteen years of age, and concludes on the whole that it exists *during their minority,* inasmuch as the father's guardianship by nature continues during that time, as also his right to appoint a testamentary guardian. This reasoning does not apply in all its force to the mother. So long as they both live, the mother's rights, so far as they exist at all, are altogether subordinate to those of the father. She cannot claim a right to the services of the children during the father's lifetime. She has a *less perfect* right to the guardianship of his *estate,* (2 *Kent,* 205, 206,) and as to the guardianship of the *person,* she may be entirely deprived of it by the exercise of the authority of the father in appointing a *testamentary guardian.* Suppose this power to have been thus exercised, would not the testamentary guardian have a right to control the services of his minor

Gray *v.* Durland.

ward, and, as a consequence, to receive the compensation for those services if rendered to any other person, and thus, in any event, to deprive the mother of them. And does not this tend to the conclusion that where the right of testamentary appointment is not exercised, the right to control the services of the child is rather designed to be confided to the *guardian* of the child, (who may or *may not* be the mother, after the father's death,) and not to the *mother*, and must hence be exercised for the pecuniary benefit of the *child*, and not of the *mother*. These considerations seem to me not without force.

The author says, at page 205 : "The father (and on his death, the mother) is *generally* entitled to the custody of the infant children, inasmuch as they are their *natural* protectors for maintenance and education." And yet we have seen that as to the *mother* the common law obligation to support the child is less onerous and less perfect than in the case of the father, and of the *custody* of the children she may be wholly deprived, and as the *right* to command the services is in a great measure supposed to arise from the correlative duty of support and right of custody thus conferred, may we not infer the absence of that perfect common law right on the part of the mother to the services of the child which is essential to maintain the constructive relation of mistress and servant.

It *may* be, as is ingeniously argued in a reported case, (*Williams* v. *Huthhinson*, 3 *Comst.* 312,) and is also suggested by the Chancellor in *Re Ryder*, (11 *Paige*, 187,) that *during the period* that the mother is in fact *furnishing support* to the minor children she is entitled to their services ; but that qualification would be fatal to the charge in the present case, which is unconditional and absolute that the mother had the absolute right to maintain the action during the minority of the child. The plaintiff's counsel further refer to *Reeve's Domestic Relations*, (*pp.* 426, 427, 428 *and notes, Gould's ed.* 1862.) The text contains some

genera. remarks on the principles which control the mainte-
nance of this action which do not call for particular remark,
and some of which are discountenanced and overruled in
some of the cases in our own courts.   But some of the cases
referred to in the notes do not support the plaintiff's posi-
tion.   Thus, at page 427, note, it is said : " The action is
founded exclusively on the relation of master and servant,
and not of parent and child, and the gist of it is the conse-
quential loss of service.  (*South* v. *Denniston,* 2 · *Watts,*
474.)   *Hence* a mother, though a widow, *not being entitled
to the service of a child,* cannot maintain this action, except
by proof of actual service at the time of seduction." (*Id.*)

At page 428, note, the authority of *Sargent* v. *Denniston,*
.(5 *Cowen,* 106,) is denied upon the ground that the right to
the services was not in the plaintiff at the time the wrongful
act was committed—the daughter being then out at service
under indentures of apprenticeship.   At page 431, note 1,
is as follows : " The mother, after the father's death, has *no
right to the services of the minor child;* nor is she liable, as
the father is liable, for the support of such child.   (*Pray* v.
*Gorham,* 31 *Maine R.* 240.   *E. B.* v. *E. C. B.,* 28 *Barb.* 299.
*Bartley* v. *Richtmyer,* 4 *Comst.* 38.   *Commonwealth* v. *Mur-
ray,* 4 *Bin.* 478.   *Williams* v. *Hutchinson,* 3 *Comst.* 312.
*South* v. *Denniston,* 2 *Watts,* 474.   10 *Ad. & E. N. S.* 725."

These authorities are now cited and relied on by the
defendant, and in addition the following citations are claimed
to support the defendant's position : 3 *Starkie's Evidence,*
title *Seduction,* 989 ;  *Wood's Inst.* 64.;  *Logan* v. *Murray,*
(6 *Serg. & Rawle.* 175 ;)  *Davies* v. *Williams,* (10 *Ad. & El.
N. S.* 725 ;)  *Williams* v. *Hutchinson,* (3 *Comst.* 312.)   Most
of these have been already mentioned.   The case of *Wil-
liams* v. *Hutchinson,* (3 *Comst.* 312,) has no very direct
bearing on the present question, although it was discussed
by counsel.   The action was to recover for work and labor,
and the plaintiff was not the mother, but the step-father.

In *E. B.* v. *E. C. B.,* (28 *Barb.* 303,) Judge INGRAHAM

seems to hold the opinion (citing the cases in 4 *Comst.* 46 ; 2 *Watts,* 274 ; 10 *Ad. & El. N. S.* 725 ; 2 *Kent,* 205 ; 4 *Bin.* 487,) that the mother, after the death of the father, is not entitled to the services of her minor children.

In *Shute v. Dorr,* (5 *Wend.* 205,) it is said by the court, but without any thing to show whether the remark was or was not intended to apply to both parents, " Parents are bound to maintain their children and are entitled to their services until they are twenty-one years of age."

In *Williams* v. *Hutchinson,* (5 *Barb.* 123,) the court, while discountenancing and denying the obligation of the step-father to maintain the children of his wife by a former husband and denying his right to recover for their services on that account, on the strength of the following authorities : *Freto* v. *Brown,* (4 *Mass. Rep.* 675 ;) *Commonwealth* v. *Hamilton,* (6 *id.* 273, 275 ;) *Worcester* v. *Marchant,* 14 *Pick.* 510,) nevertheless add, " While the mother remains a widow she is bound to provide for her children, and is entitled to control them, while under age, and to *collect their earnings while in the service of others.* But when she marries, her legal capacity is gone, and she can no longer control the persons, or property, or earnings of her children."

The case did not call for the enunciation of this principle, and upon the strength of the authorities before quoted, there seems to me great doubt of its correctness, and from the best consideration I have been able to give to the case I have come to these conclusions : 1. That the obligation of the mother both, by the common law and the statute, to support the minor children and the right to the custody of their persons and estate, is less comprehensive and perfect than that of the father, and that especially as to the custody of their persons it may be wholly divested by the testamentary act of the father. 2. That the weight of authority in this state and country as well as in England, as well as the views of learned commentators on the law, rather incline against the existence of this right in the mother. There does not ap-

pear to be, however, in our own state any case in which the precise question has come up for adjudication.

On the whole, I am inclined, for the reasons stated, to reverse the judgment and to order a new trial, with costs to abide the event.

The defendant is not entitled to relief upon his motion to set aside the verdict as against the weight of evidence. The parties implicated directly contradict each other as to the illicit intercourse ; and in regard to one or more of the occasions the defendant is corroborated, in some particulars, by some members of his family. Still, in reference to the main facts of the transaction—especially as to the last two occasions—the question mostly turns upon the comparative credibility of the two leading opposing witnesses ; and this was a question for the jury to determine. We cannot say they have erred, or that a verdict in the contrary direction would have better comported with the probabilities of the case. At any rate we cannot say that there is any such preponderence of evidence for the defendant as justifies our interference. These are emphatically cases for, the careful determination of a jury.

The motion for a new trial on the ground of surprise must also be denied, for several reasons, 1. The fact of surprise is not clearly established. The defendant swears he was surprised by the testimony of the daughter as to the time of impregnation. He ought not have been ; for he knew when the child was born, and the dates of sexual intercourse stated in the complaint. Moreover the trial was protracted, the testimony of the girl taken early in the case, and the residence of witnesses not distant from the court house. Reasonable diligence would have enabled him to procure them after the trial commenced.

2. The facts expected to be hereafter supplied are not clearly stated. He states in a general way that he expects to rebut her testimony by the testimony of certain witnesses ; but the particular facts are not disclosed (except in a single particular) to enable the court to judge of their materiality

or freedom from the objection of being cummulative.  The exception to this remark is in regard to the fact of her having made a statement to officers or members of the church, naming the occasions of criminal intercourse.  This is only stated on information and belief.  The clergyman presiding over that church (who in all probability was cognizant of the statement, if made,) was himself a witness on the trial, for the defendant, and besides, it was unnecessary to the object for which the statement was got up, that *all* the instances of sexual connection should have been stated.  The moral turpitude and stain upon the character of a member of the church were sufficiently marked by *one* such improper act to justify and demand the discipline of the religious organization with which he was connected.

3. There is no proper or sufficient proof of the facts. There is no guaranty that the witnesses, when summoned, will testify to the additional facts now sought to be supplied. Their depositions are not procured.  This is a security which the courts require that the new trial shall produce some practical result.  The practice is well settled, and in general should be strictly adhered to.  (*Graham on New Trials,* 1472, *ed. of* 1842.  *Denn* v. *Morrell,* 1 *Hall,* 382. *Phenix* v. *Baldwin,* 14 *Wend.* 62.  *Powell* v. *Jones,* 42 *Barb.* 29.)  The defendant confines himself to his own affidavit and to very general and indefinite statements of what the witnesses upon his information and belief are expected to prove, without any satisfactory assurances that they will respond to his expectations.  This is not in comformity with the practice of the court, nor with the requirements of a reasonable circumspection.

This branch of the defendant's application being founded in part upon new and distinct papers, and capable of separation from the other, must be denied, with costs.

But on account of the error in the charge to the jury heretofore discussed the judgment must be *reversed* and a *new trial granted,* with costs to abide the event.